Our next case is Keyes Helium Company, et al. versus the United States, 2024, 1132. Mr. Dolan, when you are ready. Yes, sir. I see you've chosen to split up your argument and to save a couple minutes. So basically you've got six minutes to make your case. Thank you, Your Honor. May it please the court. The Court of Claims erred in the underlying litigation because it wrote out the contract mandatory provision that the government will deliver a helium gas mixture of not less than 50 percent helium by volume. And the appellants expressly pled that argument in their original complaint. The fundamental issue here is that the direct allegation for a breach of contract that the Court of Claims wrongly read out contradicts what the expressed terms of the agreement state, and in doing so imposes or reads an obligation to monitor methane levels in the underlying storage and delivery contract. What the appellants have pled in this case is the violation of the mandatory provision contained within 2.3a, which says that the government will deliver helium not less than 50 percent by volume. And the key here is that it all derives from where the acceptance and delivery point is. Okay, so if I understand it, you've got two arguments. One is that there was an obligation to deliver 50 percent helium, which they didn't do, and there doesn't seem to be any dispute about that. And second, that the helium gas mixture that they delivered had to be less than 3 percent methane because otherwise it would ruin the refining machinery, right? So to answer the first part, there's no dispute that the amount dropped below. Why is that statement not a correct statement of what you're arguing? Well, it's not that the methane – the appellants cite the general industry standard of what the methane gas composition must be. The issue about whether or not methane is a breach isn't necessarily the primary element. That aspect of the methane being injected into the plant derives itself more to causation and damages. So what's specifically – My understanding is that you're arguing that by delivering something that had more than 3 percent methane, it would ruin your machinery and that that can't have been what the contract meant, that they would deliver something that would be unworkable, right? Well, that's true in part. The primary allegation, though, is that the breach of the contract – Let's stick with what maybe calls the non-primary allegation. You're saying that they didn't – they couldn't deliver something that had more than 3 percent methane. That would be contrary to industry practice because it would ruin the machinery, right? That is correct, Your Honor. The methane is what caused the damage in this case.  But the underlying contract, the underlying obligation for the United States to deliver the helium gas – Well, you're saying that we should read the contract as not allowing them to deliver something that would ruin the operation. No, Your Honor. We're asking that this court read that that provision contained within 2.3A is a mandatory obligation for a certain gas composition. And the primary function of that gas delivery, the predominant composition, is about helium. And when the helium dropped below that 50 percent threshold, it allowed the opportunity for some other gas to make up the remainder of it. And it just so happened to be in this case that methane was that other gas. Now, there's been a hypothetical that's been postulated that if it was nitrogen, 70 percent nitrogen, that somehow it got through the acceptance and delivery point, that we wouldn't be here today. But it's not because it wouldn't be a breach of the agreement. It's because that nitrogen is inherently an inert gas, and it wouldn't have caused the issues that methane being introduced into that compressor system would have caused. And that's what the fundamental core is here. It's still a breach of contract. There just is no actual damages or a causal nexus to tie that breach to any property damage associated with the helium refinery. So that is the core ruling on Appendix 11 on the Court of Claims, is the focus on the duty to monitor methane. And the Court of Claims based its holding reading that obligation into the agreement. Whereas on Appendix 28, Paragraph 42, and Appendix 30, Paragraphs 51 and 55, the appellants in this case have specifically pled 2.3a. It's when you read, the Court of Claims read 2.3b and 4.1d of the contract to impose a non-payment obligation and the question of whether the duty to monitor methane existed. But 4.1d is actually a penalty against the person that is delivering helium to the system. So if the person fails to meet the obligation to deliver helium at least 65%, then the credit doesn't get applied to their system on the injection of that helium and to the overall circuit. So the contract in and of itself is bidirectional in nature, meaning that there are ongoing obligations between a person and the U.S. government. But the duties and obligations on that delivery condition change. Under 2.3a, the government's minimum obligation is 50%. And under 4.1d, the person's minimum delivery obligation is 65%. You say the duty changed. What, it changed to an implied duty at that point? No, Your Honor, it doesn't change to an implied duty. It changes to, it is the same obligation on the delivery condition, but each party has a different minimum obligation under the express wording of the agreement. So the person has a heightened obligation, which effectively is controlled by 2.1, Article 2, and Article 4 of the agreement. Counselor, you're into your rebuttal time. You didn't allow for much, so do you want to continue or save it? Well, Your Honor, I'll save it. I just want to leave this for— You allocated, you made your bid. Absolutely. For those reasons, Your Honor, we believe that the court of claims should be reversed and amended. All right. Mr. Sumner, you've got seven minutes. You want to save two, so you've got five. Yes, Your Honor. I appreciate it. May it please the court. I'd like to approach this case from a slightly different angle to try to create a structure and framework in which we can work through and delineate these claims. And I'd like to start with the tort claim. The lower court erred in dismissing the tort claim, essentially creating a marriage ruling that we cannot pursue an independent claim under Texas common law for a breach of negligent performance of exercising the contract. As we allege in our complaint as an alternative claim, identifying the northern district of Texas as the appropriate venue, in Texas common law, if the injury extends to property outside of the contract, then the plaintiff can plead an independent tort claim for negligent performance of that contract and failure to exercise duty of care. For example, if I was to contract with the plumber to fix the water leak in my house, and in trying to fix that water leak, the plumber hit a gas line and blew my house up. This is your takings argument? No, this is my tort claim argument, Your Honor. I think that's not a great argument because there's no such thing as liability for negligent performance of a contract. Why don't you turn to the good faith and fair dealing? Well, Your Honor, I think the lower court, though, did err in not looking at whether or not there was an independent tort claim under Texas common law. If there was, the case could have been transferred to the northern district of Texas. But if we don't look at the tort claim and we look at the independent implied duties claim, we look at the implied duties claim, Your Honor, then we have to look at BLM did have an express duty to deliver compliant volumes of helium. Within that express duty are the specific implied duties that BLM's going to safely manage and operate that helium facility. What you're saying is there's implied duty not to supply helium, which would ruin the facility, right? Correct, Your Honor. I mean... Yes, right? And there isn't any dispute, since we're dealing with the face of the complaint, that that's what would have happened, right? If they did not safely maintain and manage and operate by introducing that methane level in, that was reasonably foreseeable that it was going to destroy the helium refinery. Methane kills helium refineries. And on the 3% standard, that's an industry standard. At the end of the day, that's a fact issue. And the lower court erred in not accepting that fact as alleged as true for purposes of examining... Why aren't you arguing a simple breach? They delivered at least twice helium at less than 50%, contrary to 23A. Isn't that a breach? That is a breach. By them not delivering those volumes, that is a breach of contract. Period. Well, not period, Your Honor, because if you look what that delivery caused was a domino effect in terms of that non-compliant delivery with more than 60% methane, which is combustible, slamming into the helium refinery caused additional damages. That's the second ground. If it was 60% methane, by definition, there was less than 50% helium. That's correct, Your Honor. And we believe that is a straightforward breach, and we believe that the lower court erred in dismissing that breach of contract claim. Okay, but you have two breach claims, as I understand. One is they delivered something which was less than 50% helium. And second, you say there was a breach because they delivered a product which would ruin our machinery because it had more than 3% methane, right? Yes, Your Honor. That's exactly right. Okay. And you're saying that industry practice is read into contracts and that industry practice would be that you don't deliver it with more than 3% methane. Yes, Your Honor. That's exactly right. Methane is totally combustible. Helium is inert. Nitrogen is inert. As we allege in our complaint, BLM sets that standard in what the normal commercial volumes of helium are at and provides those percentages. And even by BLM's definition, commercial volumes of helium have less than 1% methane. And while it doesn't expressly state that there is a limit on the methane, I think it's common practice and understood for purposes of the helium business that methane destroys helium refineries. I think the lower court erred in so narrowly construing the complaint that not to look at that, and I think the lower court erred in not accepting those facts as true to support our claims that a motion to dismiss states. The court of federal claims says nothing about industry practice, right? The contract itself does not, but I think there's a reasonable. Wait. The court of federal claims did not address the industry practice argument, as I understand it, right? No, they did not. They dismissed outright on a motion to dismiss. We had no opportunity for discovery to further support and delineate our claims, but the court was supposed to take our allegations as true at the motion to dismiss stage under Rules 8 and Rule 12, and we believe the court erred in not doing so. Counsel, do you want to save your two minutes? I would like to save my two minutes, Your Honors, if that's okay. All right. Thank you. Mr. Tully. Good morning. May it please the court. My understanding is similar to yours, Judge Dyke, about the two claims that are being asserted in this case, the first being to deliver helium that was at least 50% helium, and the second would be to not deliver more than 3% methane. So there was a breach. It's not a breach because the contract contemplates that individual deliveries of gas may not meet the specifications provided in the contract. Where does that say? Well, it's because— So helium will be delivered in a mixture not less than 50%, and at least twice, that didn't occur. That's the allegation. I think it's held important. Isn't that a fact? For the purposes of the motion to dismiss, it is, because that's what they allege, and I think that's appropriate to take that as true at the motion to dismiss stage. But looking at the contract holistically, it contemplates that deliveries may not always be at least 50% helium. The deliveries from Keys to the United States do not have to always be 50% helium. But we're talking about deliveries from the United States to Keys. I agree. I agree. The point I was just trying to make there is that the contract contemplates that deliveries from both parties may not always be at least 50% helium. I think it helps inform the section that Judge Lori identified where it describes the specifications for deliveries from the United States. So if I could just elaborate on that. If Keys delivers less than 50% helium to the United States, the United States does not credit Keys' storage account. There's a storage account for Keys' deliveries. If they're not at least 50% helium, Keys does not get credit for that. If the United States delivers helium to Keys that's not at least 50% helium— and I say helium, I mean the helium gas mixture. It's transported in a mixture with other gases. If the United States delivers a helium gas mixture that's not at least 50% helium, there's three things that happen. First, Keys does not have to pay transportation costs, and this is in Section 2.3, the same section that you identified. Keys gets title to all of the constituent gases, and the United States does not debit from Keys' storage account. Okay, but there's no preclusion of a claim for breach of contract, right? I'm sorry? There's no preclusion in the contract for breach of contract for failure to deliver 50% or more helium. There's no express preclusion to that effect. I agree with you, but in our view, I think the contract— Is there an implied covenant? An implied covenant? Yes. To do what? Well, that the storage facility does not contain more than 3% water that you won't deliver. The 3% methane.  Yes. So on that point, there is an express provision in the section of the contract that discusses the Keys' obligation to deliver helium to the United States, and it expressly says that Keys will not deliver more than 3% methane. That's, I believe, in Section 2.1. There is no corresponding provision in the section of the contract that describes the specifications of the United States to deliver. Okay, that's true, but what their argument is, that industry practice is that a helium gas mixture sold under these circumstances would contain less than 3% methane. We have cases, metric contractors, unfortunately not cited in the briefs, that say that industry practice is highly relevant in interpreting a term of a contract. And I don't know. We don't know at this point whether their allegation of industry practice is correct or not correct, but on the face of the complaint, they said it should be read in accordance with industry practice. So why isn't that a sufficient allegation? I think it's insufficient for two reasons. First, my understanding is that industry practice can be relevant if there is an ambiguity in the contract to help inform what that ambiguity means. No, I don't think that's quite true. I think metric and the other cases make clear that if there's a term in the contract that has an industry meaning, that regardless of ambiguity, you can read it in accordance with the industry meaning. And in that case, what I would say in response about why industry practice is not relevant is when you look at this particular contract and you have an express limitation on one party that appears in one section of the contract that governs the obligation of keys to deliver gas to the United States, and that same provision is absent from the section that governs the United States, is deliveries, and it's true. There is no express obligation related to the percent of methane in the section for the United States' deliveries. It would be improper to import through implication, whether by industry practice or the duty of good faith and fair dealings, a provision that the parties knew how to express and did so in one section of the contract but chose not to do so in the other section. Okay. Just to provide a little bit of background that I think could help understand why the contract was set up. Before we go there, let me understand something. You're saying that Keys was obligated to not store helium gas mixtures of more than 3% methane, right? Keys had that obligation as to deliveries from Keys to the United States.  You're saying there's no similar obligation on the government to deliver that. That's correct. And that's because the Keys' obligation is expressed in the section. Why is that not an implied covenant of good faith and fair dealings? For the same reason that I was trying to explain why industry standards we don't think are applicable here is because where you have an express provision in the contract that governs the obligations of one party, and it's expressly identified as the methane limits of no more than 3% in the section that governs deliveries from Keys. And that's for safety reasons and the whole bit, right? The 3%? I think that is what they're alleging. Methane is highly volatile. I think that is what they're alleging. So how is it then that the government imposes its obligation on Keys to not deliver helium with a mixture of more than 3% methane, but yet it's not the obligation of the government to deliver to Keys helium with the same similar condition as far as bought in by methane? I think to help understand why that is the case, it's important to have a better understanding of how this helium system works. Keys is not the only entity on the pipeline. The United States operates a reservoir, but there are other private entities. I'm looking at this more in the contract interpretation. Right. It just seems to me that there is an implied covenant of good faith and fair dealing on your part with respect to the volume of methane you're going to deliver back to your customers. I understand the concern on that point. Do you agree with that? I don't agree with it because where you have an express term that governs the obligations of one party and that's clearly written into the contract, I think it's improper to import that same obligation onto another party where they didn't bargain for that same duty. Well, that's how implied duties are created in the contract. I don't think that's how they're created when the parties chose to impose a duty on one party and expressly did so, but omitted that same duty from the other party, just reading the plain language of the contract. I think part of the reason for that- How can it possibly make sense that the government can deliver helium that's going to destroy the refinery? Contract interpretation is in large part trying to make sense out of badly drafted agreements. And there are in the commercial code, which we've looked to for government contract purposes, implied duties of merchantability, implied duties of fitness for a particular purpose. The whole of contract law recognizes that if you're buying something from somebody, it ought to work for the purpose that you get it. And so it just doesn't seem to make any sense to construe a contract that says the United States can send them garbage that will destroy the refinery. How do you deal with that? Perhaps this is not prohibited. Let me just take a step back. There are additional entities along the pipeline that put gas into the pipeline and withdraw from the pipeline. There's going to be variation on the composition of the gas in the pipeline. And I think the contract allowed for that variation. If Keyes was unable to process high methane levels that are alleged in this case by venting or otherwise, then the monitoring obligation is on Keyes at the orifice where the gas enters their pipeline. That's where the monitoring obligation exists. If they were unable to sufficiently monitor and vent the gas that had high elevated levels of methane, they could have bargained for that in the contract. There's no such express provision. There is on deliveries from Keyes but not the United States. So I think that's how I would respond to the concern there. And there could be other bodies of law that govern the conduct of the parties that are not derived simply from the contract. Because the contract perhaps does not prohibit something, does not necessarily mean that it's permitted. There could be other bodies of law, and they have brought a tort case in the Northern District of Texas, asserting that there's been tort law violations. So would you agree with me that if you lose with respect to the breach of an implied covenant, if you lose on that issue, you lose your case entirely. You also lose a breach of contract with failure of state of claim. You also lose your alternative tort claim. Losing the alternative court, the ruling on the alternative tort claims? The ruling on the alternative court claims, if I could just take for a second, there's no jurisdiction in the Court of Federal Claims to adjudicate tort claims, period. The FDCA provides that exclusive jurisdiction over tort claims is in federal district courts. That's where Keyes brought their tort claims. That's where they belong. Whatever this court does, it should not remand the tort claims to the Court of Federal Claims. There is no jurisdiction there over tort claims. What about a tort claim that arises as a result of a breach of a contract? Well, in that case— The Court of Federal Claims has jurisdiction over that claim, doesn't it? It doesn't. I respectfully—I do not believe it does. No, it does not. It would have jurisdiction over the contract dispute, and what we sometimes see in the case law is talk about nominal tort claims. And this often comes up in the pro se context where a party might allege that there was negligent infliction of emotional distress because of a breach of a contract. In that case, the Court of Federal Claims would say that the action sounds in contract. It's not a tort case that belongs in district court. It belongs in the Court of Federal Claims, and the Court of Federal Claims would adjudicate the contract dispute, but it doesn't apply state tort law on a negligence issue. It does not. That is the exclusive jurisdiction of federal district courts under the FDCA. I do think the law is clear on that. So, if there's any further questions on the implied duty of fair dealings, I'm happy to address them. I think it's an important issue for the reasons I explained earlier. Where there's an express duty on one party, we don't believe that that should be imported to another party, especially under the way that this program works, where there's multiple entities putting gas into the pipeline. Keys has more control over the gas that goes into the pipeline from the Keys plant than the United States has over the gas that is extracted. You're saying this could have been the fault of a third party? As to the allegations, there's no such allegations. Is there a fact question that takes you beyond the 12B6 stage? It just explains why the contract is structured the way it does, that allows for individual variations in specific deliveries. I believe that there is an overarching obligation in the contract for the United States to deliver gas that meets the specifications over the period of performance, in aggregate. But the contract does allow for individual incidents to not meet those specifications, provides for what happens in those circumstances. Keys does not have to pay transportation costs. It gets title to all of the constituent gases. And its storage account does not get debited. That's what happened there. And there's no dispute that those steps happened in this case. On the takings claims, in our view, they have not been adequately pleaded. The way I understand it is that there's essentially two takings claims. The first is that the United States delivered gas to them that had, in their view, too much methane. They couldn't use it. It went to waste tanks, and it got debited from the Keys' helium storage account. Because almost all of that gas was at least 50% helium. The real problem was the methane levels. That's what they're alleging. The United States debited the delivery, and about 0.0002% of that delivery was less than 50% helium. The United States credited that back to Keys' storage account. That's not a taking. That's a deliverable to Keys. There's been no taking for public use. The second part of their takings claim is damage to their facility. There's no allegation that that was done for public use. The government didn't take anything from their facility. What they've alleged there is a tort. It interferes with property. Well, they've alleged it's a breach of contract in our case to say if it's a breach theory, that precludes a takings theory. I agree with that, too. Does the government—it runs this as a private facility, right, the storage facility? It's actually—the government sold it. It's no longer running this storage facility. At the time, I think it— At the time. It was in a commercial capacity. And it was competing in the open market for storage services. I think it did have private—yeah, private agreement with private entities for the storage and transportation of the helium. Were there other storage facilities in competition with this one? With Keys, yes. Yes, there were several along the pipeline, which is why the composition of the gas changes because different entities are putting gas in and taking it out. Counsel, you have consumed your time. Mr. Dolan, you've got 1.22. If your colleague wants to—that's not much time. If your colleague wants to cede his remaining two minutes to you, that's up to the two of you. Can I give him 45 seconds, Your Honor? We'll stick with what he's got. You've got 1.22. Your Honors, there was a couple aspects that was just raised that I want to bring to the attention, is this contract is for the storage and delivery of helium. It's not just the storage or gas composition in the pipeline. There's also an underground reservoir that the government, at the time of this incident, controlled and would withdraw gas and process that gas and monitor and measure that gas and inject that gas into the pipeline. Keys just so happened to be the very first plant on that pipeline. So if whatever gas they were receiving has an issue, it came from the Cliffside Enrichment Plant directly in the control of the U.S. government. Another aspect about this is that the breach— methane is not the breach. Again, methane is the causation that caused the property damage. The breach was the failure to deliver the helium at a certain composition. I think in order to kind of reconcile the issues between the contract, the implied duty, and the tort, we have to look at the underlying purpose of the contract and what it is for. And what that purpose is is to take gas and deliver it to private entities on this pipeline. An incumbent within any party, whether accepting or delivering gas, is the obligation to monitor and ensure that the purpose of that contract isn't frustrated in the obligations to deliver that product. And it's for those reasons that the Court of Claims erred and this matter should be reversed and remanded. Thank you, counsel. Mr. Sumner has two minutes. Your Honor, just three quick points. One, regarding the implied duties. A key fact here is that BLM controls the processing plant. In our reply brief, we have a diagram that shows the facilities. BLM has 100% control over the storage facility. They have 100% control of what goes in and out of the storage facility. Next to the storage facility, you've got the processing plant. What's processed when it goes into the storage facility has to be processed. What goes out of the storage facility has to be processed to meet compliant volumes of helium. BLM 100% controls the pipeline. BLM 100% controls what goes into that pipeline. As in terms of the implied duties, when you look at the contract as a whole, when you look at the storage facilities as a whole, when you look at the entire federal helium system as a whole, it was entirely reasonable for keys to expect that BLM was going to safely maintain and operate all those facilities to deliver compliant volumes of helium. Regarding the takings claim, in terms of public use, just like they do with the breach of contract claim, the government narrowly, narrowly construes what that right is and what that volumes are. It's not just the 0.2% as it relates to what they allege is just the methane component of it. If you've got a contract claim, you don't have a takings claim. Why is that? I think there is a separate independent takings claim because the volumes that were not reimbursed to keys were used for public use, as we allege in our complaint. We allege all the facts for that independent taking claim separate and apart from the contract. We're going to parse and have the breach of the contract in terms of the delivery. There's still the damage to the facilities. There's still the fact that they couldn't accept any of the other helium volumes and the fact that those helium volumes were never subsequently delivered back to keys once the refinery was finally repaired and back up and running. As we say in our complaint, there are public users such as the Department of Defense and NASA that use those helium volumes. Those are allocated between those public users and federal agencies and between the private parties. We had a good faith basis to allege that those helium volumes that we were never reimbursed for were used for a public use without any just compensation. My last point, and not to drive the ire of this Court in terms of the tort claim. Your last point is beyond your time, so we will take the case under submission. Thank you, Your Honors. We appreciate it.